## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 4:23-CR-162** |
| **v.** | : | |
| | : | **(C.J. BRANN)** |
| **MATHEW LAMPI,** | : | |
| Defendant | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

### I.    INTRODUCTION

Defendant Mathew Lampi trafficked in stolen human remains, most egregiously the body of a baby named Lux, whom his mother thought had been cremated. Lampi's conduct, and the conduct of his coconspirators, shocks the conscience. The Sentencing Guidelines simply do not account for the egregiousness of this type of crime, and the range they yield in Lampi's case is insufficient to establish a just sentence.

Accordingly, the United States respectfully recommends that the Court depart or vary upward from the Guidelines range and impose a sentence of imprisonment of 24 months.

1

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Beginning in October 2021, Jeremy Pauley, a resident of the Middle District of Pennsylvania, began purchasing human remains from Candace Chapman-Scott, an employee of Arkansas Central Mortuary Services (ACMS), a crematorium in Arkansas.  Pauley knew that Chapman-Scott was supposed to have cremated the remains, but instead stole them from her place of employment and sold them to Pauley.  Pauley communicated with Chapman-Scott through Facebook and sent payments via PayPal.  Chapman-Scott shipped the purchased remains through the United States mail from Arkansas to Pennsylvania.

The remains Pauley purchased from Chapman-Scott included brains, internal organs, and two stillborn fetal corpses. One of the stillborn corpses was a male, named Lux by his mother, who died after a premature birth.  In or about February 2022, Lux's body was sent to ACMS for cremation by a funeral home contracted by Lux's mother. Instead of cremating the remains, Chapman-Scott stole the child's body and sold it to Pauley.

2

Matthew Lampi, a Minnesota resident, with whom Pauley had an ongoing business relationship buying, selling, and trading human remains between them, purchased several of the specimens that originated in Arkansas, knowing that Pauley had obtained them from an individual who stole them from a crematorium in Arkansas. Pauley shipped the remains, including the stillborn corpse of Lux, from Pennsylvania to Lampi in Minnesota. PSR ¶ 18. Pauley sent Lampi the body of Lux, along with $1,550, in exchange for five human skulls from Lampi. *Id.*

Lampi also purchased human hearts, brains, an arm, and a pair of "smoker's lungs," all stolen. PSR ¶¶ 11, 14, 19. The aggregate value of the transactions between Pauley and Lampi in which provably stolen remains were transported through interstate commerce exceeded $5,000.

After a warranted search of Lampi's residence failed to recover the stillborn remains, Lampi, through an attorney, voluntarily turned Lux's body over to the FBI in April 2023. PSR ¶ 18.

Mathew Lampi both bought human remains from Jeremy Pauley and sold to him as well. Investigators identified 71 payments from Pauley to Lampi totaling $119,198.25, and 8 payments from Lampi to Pauley, totaling $8,890. Additionally, Pauley was known to send cash through the mail to sellers, so Lampi may have received even more. It is evident that Lampi was in the business of buying and selling stolen human remains.

Throughout this investigation, having conducted dozens of interviews of individuals who engage in the buying, selling, stealing, collecting, and preservation of human remains, the government has yet to identify a legal means of obtaining organs, skin, or other parts of deceased human beings. The people who engage in this type of commerce maintain a don't-ask-don't-tell practice, where they often willfully ignore the provenance of the remains in which they trade. In some cases, sellers will deliberately age a specimen to make it appear to be an antique, disguising the recency of its acquisition and hiding it true origins.

4

In over two years of investigation, the government has positively identified three original sources of human remains, and all were facilities from which remains were stolen. Those were a hospital, a medical school morgue, and a crematorium. None of the so-called "oddities collectors" interviewed have ever produced any evidence that the human remains they possessed were lawfully acquired. Many have claimed certain items came from a "private collection," or were previously owned for "educational purposes," but none could explain how their previous owners came to acquire them. The government understands that there may exist historical specimens of bones, skulls, or even teeth that are so old, a true origin may be impossible to identify. But with respect to internal organs, which Lampi and other remains traffickers refer to as "wet specimens" or "wets," there are no identified legal means by which a private collector or seller can acquire those remains. These remains are invariably stolen.

On June 13, 2023, an Indictment was filed, charging Lampi with Conspiracy to Commit Interstate Transportation of Stolen Goods (18 U.S.C. § 371) and Interstate Transportation of Stolen Goods (18 U.S.C. § 2314). (Doc. 1)

On February 26, 2024, Lampi pled guilty to Count 2 of the Indictment, which charged Interstate Transportation of Stolen Goods in violation of 18 U.S.C. § 2314. Lampi stipulated that the offense involved a loss of $6,500 to $15,000 and agreed to make full restitution.

## III.   PROCEDURE

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), which rendered the United States Sentencing Commission Guidelines Manual ("USSG") advisory, the Court of Appeals set forth a three-step process when imposing a sentence:

1. Courts must continue to calculate a defendant's USSG sentence, regardless of *Booker*;

2. In doing so, they must formally rule on the motions of both parties, state on the record whether the Court is granting a departure and how that departure affects the USSG calculation, and consider pre-*Booker* case law, which continues to have advisory force; and

3. Courts are required to exercise their discretion by considering the relevant factors set forth in Title 18, United States Code,

Section 3553(a), when imposing a sentence, regardless of

whether it varies from the sentence calculated under the

USSG.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

Each of these steps is addressed below.

## A. Sentencing Guidelines Calculation

The government agrees with the guidelines calculation in the final

Presentence Report.  (Doc. 36 "PSR").  The defendant has filed no

objections to the PSR.  The government further agrees with the PSR's

recommendation that the unusually heinous nature of Lampi's offenses

warrant consideration of upward departure pursuant to USSG § 5K2.8.

PSR ¶ 84.  As discussed more fully below, the government asks this

Court to depart or vary above the otherwise applicable guidelines range

and impose a term of imprisonment of 24 months.

## B. The Parties' Motions

The government respectfully moves this Court to depart above the

guidelines range pursuant to two enumerated sections of the

Sentencing Guidelines, § 5K2.8 and § 5K2.0.  A departure under

§ 5K2.8 is appropriate because the defendant's conduct was unusually

heinous, cruel, and degrading.  A departure under § 5K2.0 is warranted
because there exist circumstances relevant to determining an
appropriate sentence that the Commission has not identified in the
guidelines.  Alternatively, the government requests an upward variance
for the same reasons.

First, the nature of this crime was especially heinous as compared
to a run-of-the-mill interstate transportation of stolen goods case
typically sentenced under the Guidelines.  "Before a departure is
permitted, certain aspects of the case must be found unusual enough
for it to fall outside the heartland of cases in the Guideline. . . .
Whether a given factor is present to a degree not adequately considered
by the Commission, or whether a discouraged factor nonetheless
justifies departure because it is present in some unusual or exceptional
way, are matters determined in large part by comparison with the facts
of other Guideline cases." *United States v. Queensborough*, 227 F.3d
149, 162 (3d Cir. 2000), quoting *Koon v. United States*, 518 U.S. 81, 98
(1996).  *See also*, United *States v. Bull*, 828 F.3d 735, 739 (8d Cir.
2016) (upward departure warranted where conduct is "outside the
heartland" of the typical case of its kind).  Nothing in § 2B1.1 accounts

8

for the theft and sale of stolen human remains. In a "heartland" theft case, the Court need not address the emotional toll of a victim parent whose grief over losing a child is compounded by the theft and exploitation of his mortal remains. Nor do the Guidelines account for circumstances where the theft and ensuing interstate transportation violate the human dignity of the deceased.

The defendant and other individuals involved in the theft and interstate trade of human remains engaged in conduct far more egregious than the typical stolen goods case. Indeed, were it not for their actions in commodifying and profiting from the sale of stolen body parts, one might be reluctant to classify such remains as "goods" at all. But these individuals stole dead babies and parts of cadavers and turned them into "stock," buying and selling pieces of deceased people, advertising their dark wares and creating a marketplace for this sick trade. Thus, it was their own actions in treating human remains as "goods," that require us to meet them where their conduct takes us in order to deliver justice for both the deceased and those who grieve them.

Mathew Lampi knew that Jeremy Pauley was buying remains that had been stolen from a crematorium. Lampi bought those remains anyway. Lampi knew that Lux's tiny body was supposed to have been cremated; he did not care. He bought Lux anyway.

Lux's mother was looking forward to his birth and was devastated when he died after a premature labor. She had a pendant made from his ashes and treasured that memento of the child she never got to know. But it was a lie; the ashes she was given were not the cremains of her lost baby boy. She grieved all over again when notified that her son had been stolen and sold as part of this macabre, underworld trade. To Lampi's credit, he did eventually turn over Lux's body so he could be returned to his mother for proper disposition, after the FBI came knocking. But the harm was already caused.

No less a victim are the deceased individuals from whom parts were stolen and sold. Their organs and limbs were harvested for profit and sold without their consent or the knowledge or permission of their next of kin. Any family whose loved one's remains passed through that Arkansas crematorium while Chapman-Scott worked there will never be at peace, forever wondering whether their loved one was cremated

10

intact or whether parts of them are sitting on someone's mantle in a jar.

These are not considerations normally present in interstate transportation cases, nor accounted for in the Guidelines.

The government is unaware of any other federal theft-related case—indeed any "basic economic offense," as the Guidelines term them—previously prosecuted anywhere in the country that involved the interstate trafficking of stolen human remains.[1]  The virtually unprecedented nature of this prosecution and the offense conduct here are strong indicators that the Guidelines have not accounted for all of the aggravating circumstances present in the instant case.  There can be no question that the cases arising from this investigation fall well

_____

[1] The closest analogue the undersigned could find was United States v. Megan Hess and Shirley Koch, involving the Sunset Mesa Funeral Home in the District of Colorado.  Case no. 20-cr-00098.  That case was fundamentally different from this one in that here the defendants bought and sold parts and bodies for personal possession and use, and there was no legitimate purpose for them to have them.  In the Sunset Mesa case, bodies were fraudulently donated for scientific research without proper authorization from the next of kin, so that the defendants could collect a broker's fee.  *See* https://www.justice.gov/usao-co/pr/sunset-mesa-funeral-home-operators-sentenced-federal-prison-illegal-body-part-scheme for more details.

outside the heartland of interstate transportation of stolen goods cases. "A district court may depart from the Guidelines if it finds that 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" *United States v. Prawdzik*, 484 Fed. Appx. 717, 722 (3d Cir. 2012), quoting *United States v. Stuart*, 22 F.3d 76, 82-83 (3d Cir. 1994).

Accordingly, an upward departure is necessary to arrive at a sentence sufficient, but not greater than necessary, to effectuate the goals of federal criminal sentencing.

### C. Assessment of Relevant § 3553(a) Sentencing Factors

The final step in the sentencing process is for the Court to consider all applicable factors set forth in Title 18, United States Code, § 3553(a) when fashioning an appropriate, individualized sentence. Here, a sentence of 24 months' imprisonment would meet the goals of punishment, deterrence, and potential rehabilitation.

The facts discussed above speak to the especially heinous and egregious nature and circumstances of the offense conduct in this case as well as certain characteristics of the defendant.

12

Also relevant is Lampi's criminal history.  While the PSR correctly assessed no criminal history points, Lampi does have prior convictions for assault and burglary of an occupied dwelling.  With respect to the assault conviction, he appears to have violated probation, presumably with the commission of the burglary given the timing, and served six additional months in prison.  PSR ¶ 40, 41.  He has thus demonstrated, albeit in his relative youth, that he has not been amenable to probationary supervision in the past.

Presently, the defendant operates an apparently successful tattoo parlor, earning $80,000 annually.  PSR ¶ 59.  His business buying and selling "antiques"—which, in reality, includes in substantial part human remains such as bones, skulls, organs, and fetal corpses—was more than twice as lucrative.  PSR ¶ 60 (grossed $182,158 in 2021).  Lampi called this business "Skull Full of Ink."  *Id.*  He lists 25 human skulls among his personal assets.  PSR ¶ 62.

Given the widespread nature of this offense, the need for deterrence is paramount.  This investigation has uncovered a secretive, nationwide market for human remains, most of which are stolen.  In this case, positive evidence of the thefts was uncovered, and so the

perpetrators can be held accountable.  But most such transactions occur in the shadows, and the sources of the remains are undisclosed. Despite knowing that "wet specimens" and fetal corpses cannot be obtained legally, the down-market trade cannot be prosecuted as it is in this case without proof that the items are stolen.  Thus, it is vital that, in a case where the evidence proves conclusively that the remains were stolen, a message must be sent to this "oddities" community, that the United States does not tolerate the theft and sale of human remains. This dark trade must end.

It is no exaggeration to describe the twisted conduct in this case as a human rights violation, a desecration of societal norms and long-held human notions of right and wrong.  This practice violates the human dignity of the deceased and inflicts suffering on their loved ones.

"The notion that the bodies of the dead and their human remains deserve respect and a dignified treatment is common to and deeply embedded within different societal, religious, and cultural traditions. Legal protections governing the treatment of dead bodies have long been established within international humanitarian law, international criminal law, human rights law, and domestic laws. . . .  The treatment

of dead bodies is also of concern to international criminal law, which prohibits the mutilation of the dead. Violation of the bodies of the dead is increasingly recognized as an element of crime, as an attack on personal dignity."  United Nations Office of the High Commissioner for Human Rights, Special Rapporteur, Apr. 25, 2024.[2]

"The protection of and respect for the dead is something that makes us human. It's prevalent, since the beginning of humanity, in all cultures and religions and is regulated in religious, cultural and social practices around the world, in national laws and also in International Humanitarian Law that applies in times of war.  The protection of the bodies and human remains of deceased persons . . . in many cases affects other rights of the victim and his or her family members. . . . There are a range of rights that are affected when there is no access to the body, when the victim's body is mutilated, destroyed,

---

[2] Available at https://www.ohchr.org/en/calls-for-input/2024/call-input-protection-dead-persons-and-their-human-remains-including-victims, last visited Dec. 20, 2024.

when their dignity is not respected." Tidball-Binz, Morris, "Protecting and respecting the dead makes us human," July 5, 2024.[3]

"Death does not erase human dignity, either immediately or completely. The consequences of certain acts of self-determination reach beyond death, and command suitable respect. Human rights are rights accruing to the living; they protect and facilitate life itself. It is only possible to speak of rights of the dead in the sense that some acquired legal rights last beyond death, such as the right to be buried. Caring for the dead in a manner appropriate to human dignity is primarily significant for the next of kin. Denying this right means that the next of kin are prevented from making their peace with the loss of an individual who is close to them. Suitable care for the dead is thus a right of the living." German Commission for Justice and Peace, "How society cares for the dead – a matter of human dignity!" July 2024.[4]

---

[3] Available at https://www.ohchr.org/en/stories/2024/07/protecting-and-respecting-dead-makes-us-human, last visited Dec. 20, 2024.
[4] Available at https://www.partner-religion-development.org/wp-content/uploads/2024/09/How-society-cares-for-the-dead-%E2%80%93-a-matter-of-human-dignity.pdf, last visited Dec. 20, 2024.

16

The conduct in this case strikes to the heart of one of the quintessential human experiences – death and the grieving process. When humans die, their loved ones frequently find solace in the peace they hope we find in death. The theft and sale of these remains for profit is a violation of any notion of peace for the dead and those who love them, and shatters any sense of security they might have felt in the belief that their loved ones are treated with dignity and respect in their final disposition.

With respect to Lampi's conduct, the government has considered the relative culpability of all defendants charged in the cases related to this one. Because Lampi did not himself steal human remains, and because he voluntarily returned Lux's body, the government assesses Lampi's culpability as lower than most, if not all, of the other defendants.

For all of these reasons, the government recommends a term of imprisonment of 24 months, a fine to disgorge part or all of the proceeds of the defendant's conduct, and restitution to Lux's mother, who has had to grieve the loss of her son twice.

17

## V.    Conclusion

Accordingly, the United States respectfully requests that the

Court grant an upward departure from the otherwise applicable

Guidelines range and impose a sentence of 24 months' imprisonment.


December 23, 2024                    Respectfully submitted,

                                     GERARD M. KARAM
                                     United States Attorney

                                     By: /s/ Sean A. Camoni
                                     SEAN A. CAMONI
                                     Assistant U.S. Attorney
                                     William J. Nealon Federal Building
                                     235 North Washington Avenue
                                     Scranton, Pennsylvania 18503
                                     570.348.2800

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIM NO. 4:23-CR-00162 |
| v. | : | |
| | : | |
| MATHEW LAMPI | : | (Chief Judge Brann) |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.  That on this Monday, December 23, 2024, she served a copy of the attached

## GOVERNMENT'S SENTENCING MEMORANDUM

by electronic means to:
<u>Addressee</u>:
Joseph D'Andrea, Esquire


Dated:  December 23, 2024          <u>s/ Terri L. Pendolphi</u>
                                   Terri L. Pendolphi
                                   Legal Administrative Specialist

19